Charlotte **FOLLMER,** Respondent,

v.

**DULUTH, MISSABE AND IRON RANGE RAILWAY COMPANY,** Appellant.

No. C5–98–868.

Court of Appeals of Minnesota.

Oct. 27, 1998.

Charles Collins, Charles A. Collins, P.A., St. Paul, for respondent.

David B. Potter, Seth J. Sergent–Leventhal, Oppenheimer Wolff & Donnelly, LLP, Minneapolis, for appellant.

Considered and decided by HUSPENI, P.J., and RANDALL and FOLEY,* JJ.

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

HUSPENI, Judge.

Appellant Duluth, Missabe and Iron Range Railway Company challenges an award of summary judgment on stipulated damages to respondent Charlotte Follmer, who was discharged when a drug test given after she suffered an injury revealed the presence of marijuana. Respondent was reinstated by the National Mediation Board but without an award of back pay. Respondent then brought this action in district court, claiming that appellant violated the Minnesota Drug and Alcohol Testing in the Workplace Act by discharging her based on a first-time positive drug test without offering her the opportunity for rehabilitation. Because federal law and regulations do not preempt a state law which governs drug testing procedures for one in the position of respondent, and because appellant discharged respondent in violation of state law, we affirm.[1]

## FACTS

Appellant Duluth, Missabe and Iron Range Railway Company operates a railroad in northeastern Minnesota. At the time of respondent's discharge, appellant employed her as a track laborer in the maintenance-of-way department at the company's facilities in Duluth. On July 31, 1996, respondent was injured while performing a track repair. The company required her to provide a sample for a drug test, pursuant to company policy that required testing whenever a supervisor reasonably believed the employee's own conduct contributed to an accident involving an employee injury. For the first time during her employment with appellant, respondent's test results were positive for the presence of marijuana.

Company policy prohibits employees from using illicit drugs at any time, on or off duty, and provides that violation of the rule is sufficient cause for dismissal. After learning of the positive test result, appellant removed respondent from her position and held a formal investigative hearing. It then notified respondent that she was dismissed effective August 1, 1996, based on the hearing testimony showing she was in violation of the rules and policies.

Respondent's union, the Brotherhood of Maintenance of Way Employees, filed a grievance against her discharge, which was appealed to the National Mediation Board pursuant to the collective bargaining agreement. The mediation board determined that appellant had proved the charges by substantial evidence, but disagreed with the penalties. The board determined that under the circumstances, appellant should give respondent "one last chance." It ordered her reinstated with seniority unimpaired, provided that she comply with conditions including participation in treatment and aftercare programs. It declined to award her back pay. After meeting these conditions, respondent returned to work on March 13, 1997.

Respondent then filed an action in district court, seeking money damages under the Minnesota Drug and Alcohol Testing in the Workplace Act. Appellant moved for summary judgment. The district court granted summary judgment to respondent and awarded her damages of $11,000, an amount stipulated to by the parties.

## ISSUES

I. Does federal law governing drug testing of "covered" railroad employees preempt a claim by a noncovered employee under the Minnesota Drug and Alcohol Testing in the Workplace Act?

II. Was the railroad employee "suspended" rather than "discharged" from her employment because she was later reinstated to her position by the National Mediation Board, precluding recovery of damages under the Minnesota Drug and Alcohol Testing in the Workplace Act?

## ANALYSIS

The district court shall grant summary judgment if the record demonstrates that

---

1. After oral argument, appellant submitted an unpublished opinion from another jurisdiction to this court. Respondent opposed consideration of the case, and appellant then requested that this court decline to consider the response. We do not find the case instructive and decline to consider it or address the parties' arguments.

there are no genuine issues of material fact for trial, and either party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03; *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993). An appellate court need not defer to the district court on questions of law. *Hubred v. Control Data Corp.*, 442 N.W.2d 308, 310 (Minn.1989). In this case, there are no disputes as to material facts and resolution of the appeal requires only an application of law.

## I.

Appellant discharged respondent after she tested positive for the presence of marijuana, a violation of company policy prohibiting any use of illicit drugs. Although respondent ultimately regained her position, she sued to recover money damages under the Minnesota Drug and Alcohol Testing in the Workplace Act, claiming that under the act, appellant was required to but did not offer her, as a first-time offender, an opportunity for treatment. *See* Minn.Stat. §§ 181.950–.957 (1996 & Supp.1997) (workplace testing act). Appellant contends that federal regulations preempt application of the workplace testing act to a railroad employee.

Congress has the authority under the supremacy clause to preempt state law through enactment of a federal statute. U.S. Const. art. VI, cl. 2; *Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Likewise, a federal agency "acting within the scope of its congressionally delegated authority" has the power to preempt state law through its regulations. *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 369, 106 S.Ct. at 1898–99.

Preemption is explicit when Congress includes express language to that effect in the legislation. *Hillsborough County v. Automated Med. Lab., Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985). If not explicit, preemption is implied

when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.

*Louisiana Pub. Serv. Comm'n*, 476 U.S. at 368–69, 106 S.Ct. at 1898 (citation omitted).

Congress enacted a federal statute whose purpose is "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101 (1994). It authorized the Secretary of Transportation to promulgate regulations for every area of railroad safety. *Id.* at § 20103(a) (1994). The secretary was specifically ordered to promulgate by October 28, 1992 regulations governing alcohol and controlled substance testing of "all railroad employees responsible for safety-sensitive functions (as decided by the Secretary) * * *." 49 U.S.C. § 20140(b)(1)(A) (1994). To the extent practicable, the laws and regulations were to be nationally uniform. *Id.* at § 20106 (1994). Nonetheless, states are allowed to adopt or continue a law or regulation related to railroad safety issues "until the Secretary of Transportation prescribes a regulation * * * covering the subject matter of the State requirement." *Id.*

The Federal Railroad Administration (FRA), Department of Transportation, promulgated regulations to "prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs." 49 C.F.R. § 219.1(a) (1997). A railroad may adopt additional or more stringent requirements that are not inconsistent with the regulations. *Id.* at § 219.1(b). "Any employee who performs *covered service* for a railroad" is deemed to have consented to testing. *Id.* at § 219.11(a) (1997) (emphasis added). A "covered employee" is defined as "a person who has been assigned to perform service subject to the Hours of Service Act (45 U.S.C. §§ 61–64b) during a duty tour." 49 C.F.R. § 219.5 (1997). The Hours of Service Act generally regulated the maximum permissible working hours for employees engaged in the movement of trains. *See* 45 U.S.C. §§ 61–64b (1988), repealed by Act

of July 5, 1994, Pub.L. No. 103–272, 108 Stat. 1379.[2] It is undisputed that respondent, who works as a track laborer in the maintenance-of-way department, did not fall into the "covered employee" category of workers subject to the Hours of Service Act.

### Explicit Preemption

█ Appellant first contends that 49 C.F.R. § 219 explicitly applies not only to "covered employees," as defined by the regulation, but also, more broadly, to the "covered subject matter," and therefore, the protections of the workplace testing act are preempted. *See* 49 U.S.C. § 20106 (state may retain law until federal regulation "covering the subject matter"); 49 C.F.R. § 219.5 (defining covered employee). The merits of appellant's argument depends, we believe, on whether respondent, clearly not falling within the description of "covered employee," nonetheless comes within the scope of the federal regulations through their application to "covered subject matter." If the preemptive reach of the regulations is broad enough to include respondent, then appellant would have the discretion to enforce against respondent its own version of the so-called rule G, an industry-wide prohibition on the use of alcohol or illicit drugs among railroad employees. *See* 49 C.F.R. at § 219.101(c) (1997) (providing "[n]othing in this section restricts a railroad from imposing an absolute prohibition on the presence of alcohol or any drug in the body fluids of persons in its employ, whether in furtherance of the purposes of this part or for other purposes"); *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 606–07, 109 S.Ct. 1402, 1407, 103 L.Ed.2d 639 (1989) (discussing rule G and noting customary sanction is dismissal).

We believe, however, that explicit preemption applies to respondent only if the regulation specifically encompasses employees in non-covered services. The FRA, in drafting the regulations, included one section explicitly addressing both covered and non-covered employees. 49 C.F.R. § 219.11(f) (1997) provides that any employee consents "to removal of body fluid and/or tissue samples necessary for toxicological analysis from the remains of such employee [who] dies within 12 hours of [certain accidents or incidents]." The section goes on to state this consent "is specifically required of employees not in covered service, as well as employees in covered service." *Id.* The FRA had no hesitancy or difficulty addressing non-covered employees when it intended to do so. . If the FRA had intended to make more provisions of the regulations applicable to employees not in covered service, we are confident that such application would have been stated unambiguously. We conclude that, unless otherwise noted, there is no explicit preemption for those who are not covered employees.

### Implicit Preemption

█ The more difficult question we must answer is whether the federal law and regulations implicitly preempt application of the workplace testing act to respondent. Generally, a court should be reluctant to find preemption when interpreting a federal statute pertaining to a subject traditionally governed by state law, to avoid encroaching on the authority of the states. *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993). "[P]re-emption will not lie unless it is 'the clear and manifest purpose of Congress.'" *Id.* (citation omitted).

**2.** The Hours of Service Act was repealed in 1994 as part of a larger act intended to "revise, codify, and enact without substantive change * * * laws related to transportation" in Title 49 and "to make other technical improvements in the Code." Act of July 5, 1994, Pub.L. No. 103–272, 108 Stat. 745. The act was intended to consolidate over 300 underlying laws with a single law, primarily in Title 49; no substantive changes were made. 139 Cong. Rec. H5339 (daily ed. July 27, 1993) (statement of Rep. Fish). This subject matter is covered generally in 49 U.S.C. §§ 20102, 21101, and 21103. *See* 45 U.S.C. §§ 61–64b (1994) (comments regarding repealed

section). In light of the fact that the Secretary promulgated the regulations referring to the Hours of Service Act well before it was repealed as part of a technical bill, and amendments to the relevant C.F.R. sections do not indicate any changes in the definition of covered and noncovered employees, we conclude that the 1994 repeal of the Hours of Service Act does not affect this analysis. *See* 49 U.S.C. § 20140(b)(1)(A) (1994) (regulations required by Oct. 28, 1992); 62 Fed.Reg. 63,466 (1997) (amending 49 C.F.R. § 219.5 to remove definition for "Field Manual" but not amending definition for covered employee referring to Hours of Service Act).

Appellant argues that the doctrine of negative preemption should apply here to preclude state regulation in the area of testing of railroad employees. *See Burlington N. R.R. Co. v. Minnesota,* 882 F.2d 1349, 1353–55 (8th Cir.1989) (holding FRA covered subject matter of caboose requirement by its regulations accommodating operation of cabooseless trains and refusal to impose caboose requirement, preempting Minnesota occupied-caboose law). Appellant contends that the Secretary of Transportation, through regulation of alcohol and drug testing, preempted the application of the general state employee alcohol and drug testing law. *See Brotherhood of Maintenance of Way Employees v. Chicago & N.W. Transp. Co.,* 514 N.W.2d 90, 93–94 (Iowa) (holding doctrine of field preemption precludes application of state law regarding employee testing in light of comprehensive drug testing regulations for railroad workers, despite fact maintenance-of-way employee not covered employee), *cert. denied,* 513 U.S. 873, 115 S.Ct. 198, 130 L.Ed.2d 129 (1994).

The resolution of the implicit preemption issue depends on how the phrase "covering the subject matter" is interpreted. *See* 49 U.S.C. § 20106. Appellant would have us interpret the phrase broadly and declare, as to railroad employees, that any state drug and alcohol testing law is preempted by the federal regulations. Respondent asserts that a more narrow interpretation should apply; that federal regulations preempt application of the state law only as to "covered employees" of the railroad.

The supreme court has recently addressed regulations "covering the same subject matter" in the context of preemption. *Easterwood,* 507 U.S. at 662, 113 S.Ct. at 1736 (addressing whether state claims of negligence under Georgia law concerning failure to maintain adequate warning devices at railroad crossing and operating train at excessive speeds were preempted by federal regulations).

To prevail on the claim that the regulations have pre-emptive effect, petitioner must establish more than that they "touch upon" or "relate to" that subject matter, for "covering" is a more restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law. The term "covering" is in turn employed within a provision that displays considerable solicitude for state law in that its express pre-emption clause is both prefaced and succeeded by express saving clauses.

*Id.* at 664–65, 113 S.Ct. at 1738 (citations omitted).

Appellant contends that when the FRA promulgated the regulations at issue here, it preempted state law on the subject because the FRA had authority to regulate those in respondent's position, even though it did not do so. Appellant contends that because maintenance-of-way workers pose a direct threat to public safety, that federal law should preempt state law. *See BMWE,* 514 N.W.2d at 93 ("[m]aintenance of way employees occupy positions designated as safety-sensitive by the Secretary of Transportation"). Appellant, while recognizing that the rehabilitation goal under the Minnesota workplace testing act provides a beneficial social policy, contends this law conflicts with the federal goal of safety throughout the railroad system. Appellant argues that application of the Minnesota workplace testing act would hobble the efforts of railroads to address the problem of substance-abusing employees, and interfere with the congressional goal of national uniformity in rail safety regulation. We cannot summarily reject these arguments.

We first examine the federal statute and regulations for guidance. The federal statute provides that a state may "adopt or continue in force" a law or regulation related to railroad safety "until the Secretary of Transportation prescribes a regulation or issues an order *covering the subject matter* of the State requirement." 49 U.S.C. § 20106 (emphasis added). *See also* 49 C.F.R. § 219.13(a) (1997) (similar preemption clause for regulations).[3]

---

3. The Minnesota workplace testing act is inapplicable if federal regulations "specifically preempt state regulation of drug and alcohol testing" when the "specific work" performed by the em-

The fact that the federal government has authority to preempt an area does not mean regulation in that area is completely preempted. *Poole v. Burlington N. R.R.*, 987 F.Supp. 753, 768 (D.Neb.1997). This is particularly true when the field is health and safety regulations, a field traditionally occupied by the states. *Id.* Nor does the fact that an agency has promulgated comprehensive regulation show preemption in itself. *Hillsborough,* 471 U.S. at 717, 105 S.Ct. at 2377. This would "be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence." *Id. See Easterwood,* 507 U.S. at 672–73, 113 S.Ct. at 1741–42 (holding that even though federal regulations provided for installation of warning devices at track crossings, state claim based on failure to maintain adequate devices not preempted where state never installed devices). When agencies can speak to the issue through a variety of means and are able, as here, to specifically address issues in detail, we assume they will make their intentions clear if they expect the regulations to be exclusive. *Hillsborough,* 471 U.S. at 718, 105 S.Ct. at 2377.

We next look to the information the agency published in the Federal Register when promulgating the regulations at issue in this case. These regulations were enacted as a result of the directive that the Secretary of Transportation prescribe regulations and issue orders "for every area of railroad safety." 49 U.S.C. § 20103(a).

The regulations were promulgated to address the problem of alcohol and drug impairment by employees who perform "safety-sensitive functions." 48 Fed.Reg. 30,723, 30,-723 (1983) (advance notice of proposed rulemaking by FRA) (notification July 5, 1983). In the process of rulemaking, the FRA heard from employees, railroads, government, unions, industry associations, and other sources, and also held hearings. 50 Fed.Reg. 31,508, 31,509 (1985) (final rule).

In addressing the scope of the proposed rules, one of the areas in which the FRA explicitly asked for guidance was which employees should be covered:

What employees should be subject to a Federal rule? Operating employees only? Signal and maintenance-of-way employees? Car forces? Operators and dispatchers? Others? Does the present coverage of [Hours] of Service Act provide an adequate definition of personnel whose functions impact on the safety of operations?

48 Fed.Reg. at 30,728.

The FRA later indicated its intent to limit the reach of the federal regulations, and gathered accident data to the extent it was able, but did not specifically consider non-train incidents in the rulemaking because the primary thrust was "prevention of accidents in railroad operations." 49 Fed.Reg. 24,252, 24,265 (1984) (notice of proposed rulemaking) (proposed June 12, 1984). The FRA also concluded that the initial regulatory effect should "concentrate on those employees who are most directly responsible for the safe movement of railroad equipment, as defined by the Hours of Service Act." *Id.* It recognized that determining which of many railroad employees should be covered by the federal rule was difficult at best. *Id.* at 24,274. Further, some railroad employees were remote from operations, such as clerical and fiscal staff. *Id.* Others were "non-transportation" employees, such as maintenance-of-way employees and others, who performed their work in the midst of train and switching movements. *Id.*

The FRA explained that "covered employees" subject to the regulation were only the hours of service employees, which it described as a practical, rather than a craft definition. This category includes train and engine crews, yard crews including switchmen, hostlers, train order and block operators, dispatchers and signalmen. 50 Fed. Reg. at 31,530 (analysis of final provisions). The FRA based its categorization on Congress's identification of this class of workers as being connected with the movement of trains, requiring maximum duty periods and time off to ensure fitness for duty. *Id.* Thus, the FRA made it clear that the regulations applied only to hours of service employees.

ployees subject them to federal regulations.

Minn.Stat. § 181.957, subd. 1(1) (1996).

The FRA also addressed its preemption clause, 49 C.F.R. § 219.13. 50 Fed.Reg. at 31,532. The preemption of state law would advance the goals of preventing drug and alcohol use by providing railroads a means to enforce anti-drink and drug rules. *Id.* It did not, however, address any intent to preempt the law specifically as to noncovered employees.

A review of the Federal Register analyses demonstrates that the focus was on the problem of drug or alcohol use by "safety-sensitive" workers who were "covered employees" under the Hours of Service Act. 49 Fed.Reg. at 24,265. The FRA explicitly decided to concentrate on the employees who directly controlled the movement of trains. *Id.* While impaired workers who do not fall within this category can also cause injuries or property damage, this was not the focus of the regulations. Further, there was no strong indication of an intent to preclude state regulation of non-covered employees.

In light of the fact that the regulations do not provide for coverage of maintenance-of-way track laborers such as respondent, that the history of the regulations do not reveal an intention to cover them, and that preemption should be narrowly construed, we agree with the district court that the state law governing workplace testing is not preempted by the federal law.

## II.

■ The Minnesota workplace testing act limits employee discharge and discipline for first-time offenders:

> [A]n employer may not discharge an employee for whom a positive test result on a confirmatory test was the first such result for the employee on a drug or alcohol test requested by the employer unless

the employee is first given the opportunity to participate in treatment and refuses to participate or fails to successfully complete the program. Minn.Stat. § 181.953, subd. 10(b) (1996). There is no dispute here that respondent's confirmatory test was the first such result, and that she successfully completed treatment.

The district court determined that respondent had been discharged, not suspended, and that the Minnesota workplace testing act had been violated because respondent had no previous positive test results and had not been offered an opportunity for rehabilitation. In awarding judgment to respondent, the court ordered appellant to pay damages of $11,000. The parties stipulated to this amount. On appeal, appellant challenges only the district court's conclusion that respondent was discharged, arguing instead that she had merely been suspended, that the workplace act was not violated, and therefore, respondent was not entitled to damages.

Appellant claims that it did not "discharge" respondent within the meaning of the workplace testing act because the mediation board ultimately reinstated her, making appellant's action toward respondent a mere suspension. Appellant first seems to argue that respondent was bound by the board's decision that she had been "suspended" and that she was precluded from arguing she was discharged under the Minnesota workplace testing act. It cites caselaw indicating that judicial review of a final decision in arbitration is very limited in determining an employee's rights under a collective bargaining agreement. *See United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960) (explaining that in arbitration issues, courts strictly confined to addressing only issues of contract interpretation regarding whether party agreed to arbitrate and whether party agreed to give arbitrator power to decide). Appellant also contends that an employee is estopped from relitigating in district court claims that were decided by an arbitrator. *Vacca v. Viacom Broad., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989).

■ The mediation board addressed respondent's reinstatement and declined to award backpay. The issues respondent raised in district court under the workplace testing act were not raised or determined by the mediation board. Arbitration is conclusive only as to claims arising out of a collective bargaining agreement. *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 254, 266,

114 S.Ct. 2239, 2244, 2251, 129 L.Ed.2d 203 (1994) (rejecting argument that claim of airline mechanic dismissed for insubordination who lost arbitration but sued under state whistleblower law for retaliatory discharge was preempted); *see also Ferrell v. Cross,* 557 N.W.2d 560, 564–65 (Minn.1997) (applying *Norris* ). The decision by the mediation board did not preclude respondent from bringing the workplace testing act claim.

We also address the merits of appellant's contention that because the mediation board reinstated respondent, she was only "suspended." Appellant cites to a provision of the act authorizing an employer to "suspend" the employee pending the result of a confirmatory test. Minn.Stat. § 181.953, subd. 10(c). If an employee is suspended without pay, upon a negative confirmatory test, the employee is entitled to back pay. *Id.* But appellant did not suspend respondent without pay pending the result of a confirmatory test. Instead, appellant, by its own words, "dismissed [respondent] from any and all service" after its formal investigation.

Finally, we note that among other remedies, the statute allows an employee who was injured by an employer's violation of the workplace testing act to file a civil action for any damages allowable at law. Minn.Stat. § 181.956, subd. 2 (1996). The court may, in its discretion, also grant any other equitable relief appropriate, including ordering reinstatement with back pay. *Id.,* subd. 4 (1996).

Respondent was discharged on August 1, 1996. She was reinstated on March 13, 1997. It appears undisputed that during this period, she received no pay or benefits from appellant. The mediation board, after reinstating respondent, explicitly did not award her compensation for time out-of-service. Even if one could argue in the abstract that suspension and ultimate reinstatement somehow resulted in no damages, that issue is not even before us. Appellant's counsel conceded at oral argument that he was not raising an issue as to the amount of damages, because he and opposing counsel stipulated to this amount before the summary judgment hearing. Appellant's argument was limited to the question of whether respondent was suspended or discharged. We have determined that she was discharged. Therefore, the award of damages, discretionary with the district court and stipulated to between the parties, was proper.

## DECISION

Federal regulations did not preempt application of the Minnesota workplace testing act, and the district court properly awarded stipulated damages after the district court determined appellant violated the act.

**Affirmed.**